

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ROBERT ELLIOTT, as the personal representative of the Estate of Nikki Listau, | ) ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | CASE NO. 5:14-CV-1309-CLS |
| MADISON COUNTY, ALABAMA, et al., | ) ) ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Robert Elliott complains of defendants, stating as follows:

### Nature of the Action

1.     This is a civil action brought by Elliott, whose decedent, Nikki Listau, was denied certain constitutional rights by defendants while incarcerated in the Madison County Jail.  Specifically, defendants were deliberately indifferent to Listau's serious medical needs in violation of Listau's rights as a pretrial detainee under the Fourteenth Amendment to the United States Constitution.  Plaintiff also brings state law claims against the health care defendants.

### Jurisdiction and Venue

2.     This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.  The Court has jurisdiction of this matter pursuant

to 28 U.S.C. §§ 1331 and 1343(a)(3).

3.     This judicial district is an appropriate venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the suit happened in this judicial district.

## Parties

4.     Robert Elliott is of legal age and a citizen and resident of the state of Alabama.  He resides in Madison County, Alabama.

5.     Defendant Madison County, Alabama is an Alabama county.  It is responsible for funding the Madison County Jail, including medical care at the jail. It contracted with defendant Advanced Correctional Healthcare, Inc. to provide medical services at the Madison County Jail.

6.     Defendant Advanced Correctional Healthcare, Inc. (ACH) is a private for-profit corporation that is under a contractual obligation to provide medical care for inmates in the Madison County Jail.  The contract is attached as Exhibit 1.

7.     Defendant Norman R. Johnson , M.D. is a physician who serves as the CEO of ACH.  He is sued in his individual capacity only.

8.     Defendant Arthur M. Williams, M.D. is a physician who was employed by ACH to provide physician medical services and to be the director of the medical program for inmates at the Madison County Jail.

9.     Defendant Janice Robinson is a Licenced Practical Nurse who was employed by ACH as the health services administrator and oversaw medical care at the jail on a day-to-day basis.

10.    Defendant Blake Dorning was the Madison County Sheriff at all relevant times.  As the sheriff, among other things, he is responsible for management of the Madison County Jail.  Defendant has a statutory duty under Alabama law to attend to the medical needs of inmates in the Madison  County Jail.  He is sued in his individual capacity only.

11.    Defendant Steve Morrison served as the jail administrator of the Madison County Jail at all relevant times.  Dorning has delegated his statutory duties regarding medical care to Morrison.  Morrison is sued in his individual capacity only.

12.    Defendant Pamela Batie was a correctional officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

13.    Defendant Jessica Pothier was a correctional officer at the Madison County Jail at all relevant times.  She/he is sued in her individual capacity only.

14.    Defendant Christine Collier was a correctional officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

15.    Defendant Vanessa Fields was a correctional officer at the Madison County Jail at all relevant times.  She is sued in her individual capacity only.

16.    Defendant Nick Wallace was a correctional officer at the Madison

3

County Jail at all relevant times.  He is sued in his individual capacity only.

17.     Defendant Roslyn Guyton was a correctional officer at the Madison County Jail at all relevant times.  She/he is sued in her individual capacity only.

18.     Defendant Randy Hooper was a correctional officer at the Madison County Jail at all relevant times.  He is sued in his individual capacity only.

19.     Defendant Michelle Kirk is a Licensed Practical Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail at all relevant times.

20.     Defendant Deondra Montgomery is a Registered Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail at all relevant times.

21.     Defendant Tanya Jones is a Licensed Practical Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail at all relevant times.

22.     Defendant Tina Adams is a Licensed Practical Nurse who was employed by ACH to provide nursing medical services for inmates at the Madison County Jail at all relevant times.

## Facts

23.     Nikki Listau was arrested at her home on the morning of March 10,

4

2013, was booked into the Madison County Jail shortly thereafter, and was found unresponsive in her cell the following day, March 11. She was taken to the hospital and was pronounced dead on March 12.

24.     When Listau was booked into the jail, she was not ambulatory without assistance, required a wheelchair to get to her cell, exhibited strange behavior, was not even able to dress herself, had poor hygiene, was identified as suffering from advanced delirium tremens (DTs) due to alcohol withdrawal, and was placed in a medical watch cell.

25.     According to the autopsy, Listau died from severe blunt force injuries, including a broken left femur and multiple rib fractures.

26.     Listau most likely suffered these injuries as a result of one or more falls, presumably from her bunk, while in her medical watch cell at the jail.

27.     Listau fell as a result of seizures related to DTs.

28.     From prior jail admissions, Listau was known to be an alcoholic with a history of DTs and seizures during withdrawal.

29.     When she was booked into the jail, Listau gave a history of daily vodka use with her last use being March 6.

30.     Because Listau had not had a drink for 4 days, she was in severe DTs.

31.     Due to advanced DTs, Listau was in severe medical distress when she was admitted to the jail on March 10.

32.     According to jail records, on March 11 at 11:19 a.m., approximately 24 hours after she was booked into the jail, Listau was found unresponsive in her cell. Emergency personnel were called, but she never recovered and was pronounced dead at the hospital on March 12.

33.     Before Listau was found unresponsive, ACH and correctional personnel had numerous opportunities to save Listau's life by sending her to the hospital.

34.     Between booking on March 10 and shortly before 11:19 a.m. on March 11, all of the individual defendants except for Dorning were aware of Listau's condition yet failed to act.

35.     During Listau's entire incarceration she was obviously weak and suffering from serious health problems of a potentially life-threatening nature.

36.     At the time of her admission to the jail, due to her severe DTs, Listau was in desperate need of hospitalization.

37.     That Listau was suffering from severe DTs was obvious to the correctional and medical personnel with whom she had contact.  DTs is a frequent problem in jails.  Defendants knew the signs and symptoms of DTs from training and past experiences and knew the condition was a life-threatening one that needed to be treated as a medical emergeny.  *See* Medline Plus, online at www.nlm.nih.gov/medlineplus/ency/article/000766.htm.

38.     Shortly after Listau was booked into the jail, at around 9:40 a.m. on

6

March 10, Listau was seen by ACH nurse Kirk, identified as suffering from severe DTs, and, shortly thereafter, placed in a medical watch cell on the instruction of ACH nurse Kirk.

39.    When Listau was booked into the jail, her vital signs were taken.  They were not taken again before Listau was found unresponsive in her cell the following day.

40.    At the time Listau was booked into the jail, due to her severe DTs, Listau's need for medical care was such that it would have been obvious even to a layperson.

41.    In her medical watch cell, Listau was checked by correctional officers every 15 minutes.

42.    In addition to defendant Kirk, ACH nurse defendants Robinson, Montgomery, Jones, and Adams and jail physician Williams were also aware of Listau's condition on March 10.

43.    On the morning of March 11 between 8:00 a.m. and 9:00 a.m., Listau was seen multiple times by ACH nurses.

44.    At around 8:15 a.m., Listau was seen by V. Holt, identified by jail records as a "mental health clinician."

45.    At this time, Listau was observed on the floor of her cell.  Listau mostly rambled incoherently but did say she could not stand.

7

46.     One or more ACH nurses and unidentified correctional officers picked Listau up and laid her on her bunk.

47.     By this time Listau was suffering from one or more of the broken bones that would cause her death.

48.     At this time the ACH nurse, unidentified in the records, did not take vital signs or otherwise attempt to determine what was wrong with Listau, though it was obvious Listau needed to go to the hospital.

49.     At 8:42 a.m., defendant Collier went to Listau's cell to get her for a court appearance (via video) and found Listau on the floor (again, the second time according to jail records).  Listau mostly rambled incoherently but did say she could not stand.

50.     Collier informed defendant Fields of Listau's condition and requested that Fields reschedule Listau's court appearance.

51.     Collier also informed Wallace (her corporal), Batie (her sergeant), and medical personnel on duty, including Williams, Robinson, Montgomery, Adams, and Jones, of Listau's condition.

52.     Batie, in turn, informed her chain of command, including Morrison.

53.     It was obvious to all involved that Listau's condition was desperate.

54.     Nevertheless, correctional and medical personnel did nothing for Listau.

55.     Rather than sending Listau to the hospital (or even checking her vital

signs), Listau's condition was intentionally documented falsely in jail records as a refusal to cooperate.

56.   Collier's report (signed off on by Batie) documented that Listau "refused" to get dressed for her court appearance.

57.   Shortly thereafter, at 9:00 a.m., ACH nurse defendant Montgomery, accompanied by defendant Guyton, went to Listau's cell to verify her reported condition.

58.   Montgomery's documentation of her contact with Listau falsely claims Listau refused to allow the medical staff to check her vital signs.  Defendant Guyton signed off on Montgomery's report as a witness knowing the report was false.

59.   All personnel involved were aware Listau was unable to communicate her medical needs.

60.   All personnel involved could see Listau needed to go to the hospital.

61.   By 9:00 a.m. on March 11, Listau's condition had become well known at the jail.  By personal observation or otherwise, numerous persons at the jail were aware of Listau's severe DTs and deteriorating condition, including all of the individual defendants except Dorning.

62.   By 9:40 a.m. on March 11, Listau was barely responsive, though still breathing. At this time, defendants Wallace, Hooper, and Guyton found Listau on the floor (again, the third time according to jail records), picked her up and put her on the

bed, and reported Listau's condition to Batie, who in turn informed ACH personnel and Morrison.

63.     Despite Listau's condition, Listau received no treatment; defendants just watched Listau deteriorate until she became non-responsive.

64.     Listau's vital signs were never checked after booking.

65.     By 11:19 a.m. on March 11, Listau was completely unresponsive and was found so.  Emergency personnel were called, and Listau was finally taken to the hospital, but correctional and ACH personnel acted too late.  Listau died at the hospital the next day.

66.     As a direct and proximate result of the failure and refusal of the individual defendants except Dorning to secure emergency medical treatment for Listau, Listau suffered pain and suffering and eventually died.

67.     All defendants were jointly and severally the proximate cause of Listau's pain and suffering and eventual death.

68.     The actions of correctional and ACH personnel indicate systemic breaches of fundamental standards of correctional management and correctional health care.

69.     These breaches are indicative of inadequate policies and practices and inadequate training and supervision.

70.     The treatment of Listau falls far below the standard of correctional health

care.

71.    Because Listau was not appropriately treated, she experienced unnecessary pain and suffering and eventually died.

72.    All of the individual defendants identified above acted with malice and/or with reckless disregard for Listau's constitutional rights.

73.    Listau's serious medical needs were ignored because of the customs or policies of defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH of deliberate indifference to the serious medical needs of prisoners in the Madison County Jail.

74.    With deliberate indifference to the serious medical needs of inmates, defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH failed to develop and implement adequate policies and procedures for the handling of inmates with serious health conditions and failed to adequately train correctional officers and medical staff, with the foreseeable result that inmates such as Listau would not receive appropriate treatment.

75.    More generally, defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH have established deliberately-indifferent customs or policies concerning inmate medical care, including but not limited to a custom or policy of delaying or denying necessary medical treatment to avoid liability for inmate medical bills.

76.     Defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH were also part of an explicit or implicit agreement or plan to delay or deny necessary medical care to avoid having to pay for medical care for the inmate.  This plan included a custom or policy of delaying or denying necessary medical treatment by outside providers.  Defendants were aware this policy created a substantial risk of serious harm and inflicted unnecessary pain and suffering on inmates.

77.     Defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH were on notice that the above-described customs or policies regarding medical care for inmates were harmful to the health of inmates and caused them to experience unnecessary pain and suffering due to delay and denial of necessary medical care. Defendants had such knowledge from prisoner complaints, communications from correctional officers, from their own observations, from common sense, from other deaths, from other lawsuits, and in other ways.

78.     During 2013 at least three inmates died as a result of the failure of ACH and correctional personnel at the Madison County Jail to provide inmates with medical care, and the undersigned has filed suit on behalf of each of the families.

79.     Listau died in March.

80.     Deundrez Woods died in August.  The circumstances of his death are described in detail in the first amended complaint filed in that case today, October 29, 2014. The case number is No. 5:14-cv-01964-IPJ.

12

81.     Woods experienced a severe and sudden change in mental functioning in late July 2013, was moved into a medical watch cell on August 6, 2013, and continued to deteriorate from August 6 until he was found non-responsive on August 19, 2013.  Woods was suffering from the effects of a gangrenous right foot.  His mental status change was due to that infection, and he ultimately died from a blood clot that originated in his gangrenous foot.  By at least August 15, when Woods was taken by wheelchair to court, Woods was incoherent and not ambulatory.  From August 15 until he was found non-responsive on August 19, while being checked every 15 minutes by correctional officers, Woods went from incoherent and non-ambulatory to barely responsive to dead.  During this period, Woods did not eat or drink, did not have his vital signs checked, and was not seen even a single time by ACH personnel.

82.     Tanisha Jefferson died in October.  The circumstances of her death are described in detail in the first amended complaint filed in that case today, October 29, 2014. The case number is 5:14-cv-01959-AKK.

83.     For several days before her death, Jefferson complained of severe abdominal pain.  She cried and begged to be able to go to the hospital.  She had been unable to have a bowel movement for approximately two weeks and died from a bowel obstruction.  Her severe abdominal pain, an obvious sign something was seriously wrong, was known to correctional and ACH medical personnel for many

days prior to her death, yet the only treatment she received was a laxative. Even when her bowel burst, emergency personnel were not contacted. Instead, Jefferson was taken to the medical department. Emergency personnel were only contacted when Jefferson became non-responsive.

84.     All three inmates died even though they had been seen by ACH personnel.

85.     All three inmates died when ACH personnel refused to send them to the hospital.

86.     In all three cases, correctional officers deferred to ACH medical personnel even though it was obvious ACH was doing nothing for the inmate.

87.     In all three cases, correctional officers deferred to ACH medical personnel even though it would have been obvious to a layperson that the inmate needed to be sent to a hospital for evaluation and treatment.

88.     Correctional officers deferred to ACH personnel because they were trained to do so.

89.     Correctional officers did not defer to ACH in ignorance, however.

90.     ACH had been the contractor at the Madison County Jail since before 2010.

91.     It was well known to Madison County correctional officers that ACH had a practice of delaying or denying referrals of inmates for outside medical care.

92.     Correctional officers were aware that ACH was making medical care decisions regarding inmates that put cost control over inmate health and safety.

93.     Dorning and Morrison made it clear to correctional officers that inmate healthcare costs were a problem at the jail, that one trip to the hospital could potentially blow the county's healthcare budget, and that they needed to cooperate with ACH to control costs.

94.     These concerns with inmate healthcare costs have been reported in the media.  Thus, an April 2014 AL.com article, for which Morrison and ACH CEO Norman Johnson were interviewed, does not mention the three 2013 deaths or improving inmate healthcare but rather discusses the budget problems created by catastrophic cases that can "really cripple your budget," in the words of Morrison, and the "aggressive pursuit" of cost savings by Morrison.   A copy of the article is attached as Exhibit 2.

95.     Consistent with this deferral-to-ACH policy, neither Dorning nor Morrison took any steps to investigate the circumstances of the three deaths.

96.     This has been a longstanding practice of Dorning and, since he was hired in October 2010, Morrison.

97.     Morrison was hired to cut costs at the jail.

98.     The failure and refusal to investigate serious incidents is a more general practice of Dorning, who has refused to investigate serious allegations against his

15

deputies, as reflected by the public comments of Dorning's chief deputy regarding the revenge beating of Robert Bryant. *See* AL.com article attached as Exhibit 4.

99.     Dorning has completely failed and refused to investigate serious allegations against those he supervises, whether as law enforcement officers or correctional officers.

100.    The uninvestigated 2013 deaths followed on the heals of at least three deaths in the preceding two-and-a-half years.

101.    In August 2010, Julie Jean died under circumstances similar to those in the 2013 deaths, particularly Woods' death. Like Woods, Jean, during her final days, was in medical watch, was checked by correctional officers every 15 minutes, did not eat or drink in substantial amounts, did not have her vital signs monitored, was completely out of touch with reality, and deteriorated over the course of days until she became non-responsive.  She died as a result of lithium toxicity.

102.    There was no investigation of the death of Jean by Dorning or his designee.

103.    In December 2011, Emanuel Patterson died from lithium toxicity under nearly identical circumstances to those in the Jean case.  Patterson was in medical watch, was checked by correctional officers every 15 minutes, did not eat or drink in substantial amounts, did not have his vital signs monitored, was completely out of touch with reality, and deteriorated over the course of days until he became non-

responsive.

104.   There was no investigation of the death of Patterson by Dorning or Morrison.

105.   Frederick Foster died in a restraint chair in a medical watch cell in May 2012.  Like Jean and Patterson (and Woods), Foster was out of touch with reality, did not eat or drink in substantial amounts, did not have his vital signs monitored, and deteriorated over the course of several days as correctional officers and ACH personnel watched.  No action was taken until he became non-responsive.

106.   There was no investigation of the death of Foster by Dorning or Morrison.

107.   Of course, others have suffered and been lucky enough to survive.

108.   As a result of publicity regarding the 2013 death lawsuits, the undersigned has received information regarding other incidents involving deliberate indifference to medical needs under ACH, including a woman who could have died from an abscessed tooth that was ignored for two months and more than one inmate who was not taken to the hospital for many hours despite obvious heart attack symptoms.

109.   Medical care at the jail is and has been a regular subject of inmate grievances.

110.   While not all inmate grievances have merit, pursuant to longstanding

practice, grievances related to medical care are not investigated by Madison County correctional personnel or ACH.

111.   Pursuant to longstanding practice, all grievances regarding jail medical care are turned over to ACH and are not reviewed by Dorning or Morrison or any other correctional officer or correctional supervisor.

112.   ACH does not respond to inmate grievances.  It simply ignores them.

113.   Pursuant to longstanding practice, jail healthcare is treated as solely within the discretion of ACH personnel.

114.   Dorning, Morrison, Johnson, Williams, Robinson, and ACH have failed and refused to evaluate the quality of inmate medical care and address the obvious systemic problems that led to at least 6 deaths over the course of just over three years (August 2010 to October 2013).

115.   Even after the 2013 death lawsuits, Dorning's comments to the media (*see* AL.com article attached as Exhibit 3) make clear Dorning believes the responsibility for the deaths and for making changes lies with ACH.  "I'm sure ACH will evaluate how they do things," Dorning told the reporter.

116.   Dorning's claim that he believes ACH will reevaluate in light of the lawsuits is not credible.

117.   Dorning knows from years of experience with ACH, and from ACH's failure to respond to the deaths themselves and to other incidents, that ACH will

conduct no evaluation and institute no training or other changes.

118.   Dorning and Morrison know that they never requested ACH to make changes or improve the care of inmates.

119.   Dorning and Morrison have never even requested that ACH report to them regarding the quality of the care provided inmates.

120.   The sole basis used by Dorning and Morrison to evaluate ACH is cost control.

121.   Consistent with Dorning's and Morrison's laser focus on costs and lack of concern about the quality of inmate healthcare provided by ACH, in the April 2014 AL.com article referenced above (Exhibit 2), Morrison does not mention the 6 inmates who died while being overseen by ACH personnel since 2010, only the one inmate, Patterson, who "crippled" the budget with over $300,000 in charges because he was in a coma for an extended period.

122.   The deferral of correctional officers to ACH decisions to delay and deny necessary medical care in the name of cost control is not only a matter of longstanding practice, it is also a matter of contract.

123.   Deferral by correctional officers to ACH deliberate indifference is caused by both the letter of the contract and the structure of the contractual relationship.

124.   ACH has had the Madison County contract since before 2010.

125.   ACH underbid other competitors to get the contract.

126.   ACH got the contract by touting its ability to control the expenses Madison County would incur for outside medical care like that needed by Listau, Woods, and Jefferson.

127.   ACH, Madison County, and Dorning negotiated a $200,000 per quarter cap on outside medical care.

128.   If outside medical care costs exceeded $200,000 in a quarter, Madison County would be responsible.

129.   Based on historical healthcare expenditure numbers for the Madison County Jail and reasonable predictions based on data for the inmate population at the jail, the $200,000 per quarter number was designed to give ACH a financial incentive to control outside medical costs, which in turn has led ACH to delay and deny referrals to outside providers.

130.   Under the contract, if ACH beats the cap, ACH gets to keep the difference between actual outside costs and the cap as profit.

131.   As Morrison, to whom Dorning has delegated responsibility for managing the jail, has stated publically, hospitalizations can quickly deplete the quarterly budget (*see* Exhibit 3).

132.   Pursuant to this agreement, correctional officers are trained to defer to ACH regarding medical matters regardless of the severity of the inmate's conditon.

20

133.   Correctional officers are trained not to contact emergency personnel even if there is a medical emergency; instead, they are trained to contact ACH nurses on duty.

134.   Correctional officers who have contacted emergency personnel directly have been disciplined.

135.   Moreover, the agreement requires ACH to provide substantial insurance coverage, to name the county and the sheriff as additional insureds, and to indemnify the sheriff, the county, and their agents and employees in connection with any claim related to healthcare services.

136.   Under the contract, as long as correctional officers let ACH medical personnel make medical decisions, correctional officers are indemnified by ACH's insurance carrier.

137.   Thus, the contract encourages correctional officers to defer to ACH personnel.

138.   Correctional officers have claimed or are expected to claim they cannot be responsible for deficient medical care by ACH personnel.

139.   Dorning, Morrison, and the correctional officers they supervised, however, were well aware that ACH provided substandard and frequently inhumane medical care.

140.   Correctional officers had this knowledge from the incidents described

above, from other similar incidents over the years, from their daily observations regarding how ACH personnel treated inmates, and in other ways.

141.   Defendant Williams has been the Madison County Jail physician for many years, worked under prior contractors, and was known to provide substandard care to inmates.

142.   Defendant Robinson as well has been at the Madison County Jail for years and was known to be deliberately indifferent to inmate medical needs.

143.   In whole or in part because of the agreement, particularly its indemnification provision, Dorning and Morrison have failed and refused to address known systemic deficiencies regarding medical care at the Madison County Jail.

144.   Under the agreement, for Madison County to avoid liability for excess medical care expenses, it was necessary for defendants Dorning and Morrison and the correctional officers they managed to cooperate with ACH in controlling costs.

145.   Defendants Madison County and ACH and all individual defendants were aware the cost control measures implemented at the Madison County Jail by ACH resulted in the denial of constitutionally-required medical care for inmates with serious medical needs.

146.   ACH's business model, reflected in the agreement, succeeds by underbidding the competition and implementing severe cost control measures, the necessary result of which is unnecessary inmate suffering and liability claims (dealt

with through liability insurance).

147.   Defendants Dorning and Madison County were aware of ACH's business model, were aware ACH put cost control over inmate health and safety, yet retained ACH as the contractor  (initially and via contract renewals) because it saved the county money.

148.   Madison County and Dorning rejected other contractors because they believed ACH saved them money.

149.   Thus, Madison County caused or contributed to the above-described customs or policies by not providing adequate funds for inmate medical care.

150.   The primary areas in which ACH implemented cost control measures were staffing, medications, and referrals to outside providers.

151.   In order to control costs, defendant ACH, with the knowledge and consent of defendants Dorning and Morrison, staffed the Madison County Jail inadequately, hired sub-standard medical personnel willing to put costs over inmate health and safety, denied inmates medications, and delayed or denied medically-necessary referrals to outside providers, including necessary medical treatment like that denied Listau, Woods, and Jefferson.

152.   Alabama law vests final policymaking authority for inmate medical care in Dorning, as the representative of Madison County.

153.   Defendant Dorning, in turn, via the agreement with ACH and

23

longstanding practice, has delegated final policymaking authority regarding inmate medical care to ACH, and, therefore, he is liable for ACH decisions.

154.   While the agreement gives Dorning and Madison County the authority to hold ACH accountable regarding the costs of inmate healthcare, it provides no mechanism for reporting and accountability regarding the quality of inmate healthcare, and neither Dorning nor Madison County have made any effort to hold ACH accountable for how it handles inmate healthcare.

155.   Directly applicable to the death of Listau, defendants Dorning, Morrison, Williams, Robinson developed a policy and practice regarding treatment of inmates withdrawing from alcohol and drugs.   While defendants were aware that severe withdrawal symptoms, including DTs, could only be safely treated in the hospital, these defendants established a custom or policy that withdrawal would **always** be managed inside the jail or by getting the person released from jail, regardless of the severity of the symptoms.   Defendants were aware of the risk of harm of such a policy but explicitly or implicitly agreed to this practice to avoid the huge cost associated with a hospitalization.   *See* Medline Plus, online at www.nlm.nih.gov/medlineplus/ency/article/000766.htm (noting that a person experiencing DTs may need to be kept in a sedated state for a week or more).

156.   Dorning's public comments regarding the three lawsuits (*see* Exhibit 3)

reflect a callous attitude toward inmates suffering from alcohol or drug withdrawal.

157.   In summary, the deliberately-indifferent policies and practices of Dorning, Morrison, Johnson, Williams, Robinson, and ACH in place at the Madison County Jail include, but are not limited to, the following:

a.   Not investigating serious known incidents of deliberate indifference by ACH and correctional personnel;

b.   Not evaluating or responding to inmate grievances regarding medical care;

c.   Placing inmates with serious medical conditions in medical watch when they obviously need, at a minimum, further testing and evaluation at a hospital;

d.   Training correctional officers to defer to ACH medical decisions even when it is obvious the inmate needs to immediately go to the hospital (i.e., severe abdominal pain and clear heart attack symptoms);

e.   Allowing inmates in medical watch to deteriorate over the course of hours and days without taking the inmate for evaluation and treatment at a hospital;

f.   Training correctional officers to defer to ACH decisions to allow inmates in medical watch to deteriorate over the course of hours and days without taking the person to a hospital for evaluation and treatment

of the obvious deterioration;

g.     Relying on untrained correctional officers to monitor seriously ill inmates who are placed in medical watch;

h.     Not training correctional officers regarding what signs to look for and document while monitoring inmates under suicide or medical watch;

i.     Not monitoring the vital signs of inmates who are placed in medical watch;

j.     Not requiring correctional officers to document their observations of inmates being monitored for suicide or medical risk;

k.     Not monitoring the food and water intake of inmates known not to be eating or drinking or to be doing so only in limited amounts;

l.     Treating the responses of incoherent inmates as refusals to cooperate;

m.     Not treating an inmate's deterioration to the point they are no longer ambulatory as a condition requiring evaluation and treatment in a hospital;

n.     Not investigating, by testing or otherwise, the causes of significant deteriorations of inmate health or symptoms that obviously indicate potentially life-threatening conditions;

o.     Continuing failed treatment regimens even after they have proven ineffective (i.e., Jefferson's constipation);

26

p.   Denying inmates with serious pain appropriate pain medication, including narcotics;

q.   Not taking inmates suffering from serious complications related to detoxification from alcohol and drugs to the hospital; and

r.   Ignoring possible medical needs of inmates with mental health issues (or perceived mental health issues) that limit or prevent the inmate from communicating with correctional and medical personnel regarding their medical needs.

158.   Defendant ACH acted through one or more individuals who acted as final policymakers for ACH, including defendants Johnson, Williams, and Robinson.

159.   All defendants acted jointly and in concert with each other. Each defendant had the duty and the opportunity to protect Listau, to obtain necessary medical treatment for Listau in a timely manner and/or to establish policies and procedures and implement training regarding such treatment, but each defendant failed and refused to perform such duty, thereby proximately causing Listau's pain and suffering and eventual death.

160.   All defendants, acting under color of state law, inflicted or caused to be inflicted cruel and unusual punishment upon Listau in violation of the Fourteenth Amendment to the United States Constitution. All defendants acted with deliberate indifference.

27

161.   All defendants acted with intent to violate Listau's constitutional rights or with reckless disregard for those rights, justifying punitive damages against the individual defendants and ACH.

162.   As a result of the conduct of defendants, Listau suffered physical and emotional injuries and then died.

## Count I - 42 U.S.C. § 1983 -
## Deliberate Indifference to Serious Medical Needs

163.   The individual defendants except Dorning and Johnson, acting under color of state law within the meaning prescribed by 42 U.S.C. § 1983, were deliberately indifferent to Listau's serious medical needs as described above.  These defendants, despite knowledge of a serious medical need, took no action or clearly inadequate action and did thereby deprive Listau of her rights as a pretrial detainee under the Fourteenth Amendment to the Constitution of the United States in violation of 42 U.S.C. § 1983.

164.   Defendants Dorning, Morrison, Johnson Williams, and Robinson are supervisory officials for the jail and were responsible for development and implementation of policies and procedures for medical care at the jail and by action and inaction established the unconstitutional customs and policies described above. These defendants did thereby deprive Listau of her rights as a pretrial detainee under the Fourteenth Amendment to the Constitution of the United States in violation of 42

U.S.C. § 1983.

165.   Defendant Madison County intentionally refused to adequately fund medical care as described above with deliberate indifference to the serious medical needs of inmates such as Listau, had a policy of not adequately funding inmate medical care, and did thereby contribute to cause Listau's suffering and eventual death and the individual defendants' denial of necessary medical treatment for Listau's serious medical needs.

166.   Defendant Dorning is also liable for the acts of ACH and its policymakers, including Johnson, Williams, and Robinson, as Dorning has delegated his final policymaking authority to them.

167.   As a result of the conduct of defendants, Listau was caused to suffer physical and emotional injuries and damages and died.

## Count II - Negligence / Wantonness

168.   The individual ACH defendants and unknown ACH employees involved with Listau's care owed a duty to Listau to meet the standard of care applicable to inmates and/or to make sure those under their supervision were trained adequately regarding the proper care of such inmates and that adequate policies and procedures regarding the proper care of such inmates were in place.   This standard of care required, among other things, appropriate monitoring of Listau's deteriorating

condition and referral of Listau for emergency medical treatment outside of the jail. These defendants negligently and/or wantonly violated this standard of care or caused it to be violated with the foreseeable result that Listau suffered unnecessary pain and suffering and died.

169.   Because ACH personnel were acting within the scope of their employment, defendant ACH is liable for their negligence and/or wantonness.

## Other Matters

170.   All conditions precedent to the bringing of this suit have occurred.

## Relief Sought

171.   As relief, plaintiff seeks the following:

a.   That plaintiff be awarded such compensatory damages as a jury shall determine from the evidence plaintiff is entitled to recover;

b.   That plaintiff be awarded against the individual defendants such punitive damages as a jury shall determine from the evidence plaintiff is entitled to recover;

c.   That plaintiff be awarded prejudgment and postjudgment interest at the highest rates allowed by law;

d.   That plaintiff be awarded the costs of this action, his reasonable attorney's fees, and his reasonable expert witness fees;

e.   That plaintiff be awarded appropriate declaratory and injunctive relief; and

f.   That plaintiff be awarded such other and further relief to which plaintiff is justly entitled.

Respectfully submitted,


s/ Henry F. Sherrod III
Henry F. Sherrod III (ASB-1200-D63H)
HENRY F. SHERROD III, P.C.
119 South Court Street (35630)
P. O. Box 606
Florence, Alabama 35631-0606
Phone: 256-764-4141
Fax: 877-684-0802
Email: hank@alcivilrights.com

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following: H.C. Ireland, III, Christie J. Strange, George W. Royer, Jr., David J. Canupp, H. Harold Stephens, and Harold D. Mooty, III.


s/ Henry F. Sherrod III