FILED
2015 Mar-09  AM 10:51
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT ELLIOTT, as** | ) | |
| **personal representative of the** | ) | |
| **Estate of Nikki Listau, deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 5:14-cv-1309-CLS** |
| | ) | |
| **MADISON COUNTY, ALABAMA,)** | | |
| ***et al.,*** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Robert Elliott, commenced this action in his representative capacity as personal representative of the Estate of Nikki Listau, deceased, who died while she was incarcerated in the Madison County, Alabama, Jail. Plaintiff's Second Amended Complaint asserts claims against eighteen defendants: *i.e.,* (1) Madison County, Alabama; (2) Advanced Correctional Healthcare, Inc. ("ACH"), an entity that is described as "a private for-profit corporation that is under a contractual obligation to provide medical care for inmates in the Madison County Jail";[1] (3) Norman R. Johnson, M.D., ACH's Chief Executive Officer; (4) Arthur M. Williams, M.D., "a physician who was employed by ACH to provide physician medical services and to

---

[1] Doc. no. 53 (Second Amended Complaint) ¶ 6.

be the director of the medical program for inmates at the Madison County Jail";[2] (5)

Janice Robinson, "a Licensed Practical Nurse who was employed by ACH as the

health services administrator and oversaw medical care at the jail on a day-to-day

basis";[3] (6) Blake Dorning, the Sheriff of Madison County; (7) Steve Morrison, the

Administrator of the Madison County Jail; (8) Pamela Batie, a correctional officer at

the Madison County Jail; (9) Jessica Pothier, a correctional officer at the Madison

County Jail; (10) Christine Collier, a correctional officer at the Madison County Jail;

(11) Vanessa Fields, a correctional officer at the Madison County Jail; (12) Nick

Wallace, a correctional officer at the Madison County Jail; (13) Roslyn Guyton, a

correctional officer at the Madison County Jail; (14) Randy Hooper, a correctional

officer at the Madison County Jail; (15) Michele Kirk, a Licensed Practical Nurse

employed by ACH to provide nursing services to inmates at the Madison County Jail;

(16) Deondra Montgomery, a Registered Nurse employed by ACH to provide nursing

services to inmates at the Madison County Jail; (17) Tanya Jones, a Licensed

Practical Nurse employed by ACH to provide nursing services to inmates at the

Madison County Jail; and (18) Tina Adams, a Licensed Practical Nurse employed by

ACH to provide nursing medical services for inmates at the Madison County Jail.[4]

---

[2] *Id.* ¶ 8.

[3] *Id.* ¶ 9.

[4] *Id.* ¶¶ 5-22.

All of the individual defendants were sued in their individual capacities only.

The Second Amended Complaint asserts two claims.  The first claim, for deliberate indifference to serious medical needs in violation of the Fourteenth Amendment to the United States Constitution, appears to be asserted against all individual defendants,[5] as well as against defendant Madison County.[6]  The second claim, for negligence and/or wantonness under Alabama law, is asserted against defendant ACH, as well as against all individual defendants who were employed by ACH, including Johnson, Williams, Robinson, Kirk, Montgomery, Jones, and

---

[5] *Id.* ¶ 163 ("The individual defendants except Dorning and Johnson, acting under color of state law within the meaning prescribed by 42 U.S.C. § 1983, were deliberately indifferent to Listau's serious medical needs as described above."), ¶ 164 ("Defendants Dorning, Morrison, Johnson, Wiliams, and Robinson are supervisory officials for the jail and were responsible for development and implementation of policies and procedures for medical care at the jail and by action and inaction established the unconstitutional customs and policies described above.").

[6] Doc. no. 53 (Second Amended Complaint) ¶ 165 ("Defendant Madison County intentionally refused to adequately fund medical care as described above with deliberate indifference to the serious medical needs of inmates such as Listau . . . .").  The Eleventh Circuit has held that

> [d]eliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976).  Correctional officers are, of course, bound by the Eighth Amendment's prohibition against cruel and unusual punishment. *Id.*  Technically, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees like [Lisau]. *Snow ex rel. Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1268 (11th Cir. 2005).  However, the standards under the Fourteenth Amendment are identical to those under the Eighth. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005).

*Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007) (alterations supplied).

Adams.[7]

The case currently is before the court on the following motions: (1) the motion to dismiss plaintiff's Second Amended Complaint filed by defendant Madison County, Alabama;[8] (2) the motion to dismiss plaintiff's Second Amended Complaint filed by defendant Sheriff Blake Dorning;[9] (3) the motion to dismiss plaintiff's Second Amended Complaint filed by correctional officer defendants Steve Morrison, Pamela Batie, Jessica Pothier, Vanessa Fields, Nick Wallace, Roslyn Guyton, and Randy Hooper;[10] and, (4) the motion to dismiss plaintiff's Second Amended Complaint filed by defendant Arthur M. Williams, M.D.[11] Upon consideration of those motions, the movants' briefs, and plaintiff's responses, the court concludes that all motions are due to be denied.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b) permits a party to move to dismiss a complaint for, among other reasons, "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). This rule must be read together with Rule 8(a), which requires that a pleading contain only a "short and plain statement of the claim

---

[7] Doc. no. 53 (Second Amended Complaint) ¶¶ 168-69.

[8] Doc. no. 60.

[9] Doc. no. 62.

[10] Doc. no. 64.

[11] Doc. no. 67.

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While that

pleading standard does not require "detailed factual allegations," *Bell Atlantic Corp.*

*v. Twombly*, 550 U.S. 544, 550 (2007), it does demand "more than an unadorned,

the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (citations omitted). As the Supreme Court stated in *Iqbal*:

> A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [*Twombly*, 550 U.S., at 555]. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557.
>
> To survive a motion to dismiss founded upon Federal Rule of Civil Procedure 12(b)(6), [for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Id.*, at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).
>
> Two working principles underlie our decision in *Twombly*. *First*, the tenet that a court must accept as true all of the allegations contained in a complaint is *inapplicable to legal conclusions*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.*, at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)).

Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Second*, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id*., at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not "show[n]" — "that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. *When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.*

*Iqbal*, 556 U.S. at 678-79 (emphasis supplied) (first alteration supplied, other alteration in original).

## II. FACTUAL ALLEGATIONS OF PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff's Second Amended Complaint contains 140 paragraphs of factual allegations, spanning approximately 24 pages.[12] There is no need to reiterate all of those factual allegations here. Instead, this section will contain a summary of the underlying facts that form the basis for plaintiff's claims, and other facts will be

---

[12]*See* doc. no. 53 (Second Amended Complaint) ¶¶ 23-162.

addressed, as necessary, in the context of discussing the various defendants' motions to dismiss.

Plaintiff's decedent, Nikki Listau, was arrested from her home on the morning of March 10, 2013, and was booked into the Madison County Jail that same day.[13] At the time of booking, she "was not ambulatory without assistance, required a wheelchair to get to her cell, exhibited strange behavior, was not even able to dress herself, had poor hygiene, was identified as suffering from advanced delirium tremens (DT's) due to alcohol withdrawal, and was placed in a medical watch cell."[14]  From past jail admissions, Listau was known to be an alcoholic with a history of DT's and seizures during alcohol withdrawal.[15]  At booking, Listau reported that she normally consumed vodka daily, but her last use had been four days earlier, on March 6th.[16]

All of the individual defendants, other than Sheriff Dorning, eventually became aware of Listau's medical condition.  They also were aware of the symptoms and seriousness of DT's due to their prior training and experience.[17]

At approximately 9:40 a.m. on March 10, defendant Kirk identified Listau as

---

[13] *Id.* ¶ 23.

[14] *Id.* ¶ 24.

[15] *Id.* ¶ 28.

[16] *Id.* ¶ 29.

[17] *Id.* ¶¶ 34, 37.

suffering from severe DT's and placed her under medical watch.[18]   Correctional

officers checked Listau every fifteen minutes thereafter.[19]   Defendants Robinson,

Montgomery, Jones, Adams, and Williams also became aware of Listau's condition

on March 10.[20]  There are no other allegations about anything that occurred or did not

occur on March 10:  the date of her entry to the jail.

Listau was seen by ACH nurses "multiple times" between 8:00 and 9:00 a.m.

on March 11.[21]  At approximately 8:15 a.m., Listau also was seen by an unnamed

mental health clinician, who observed her on the floor of her cell, rambling

incoherently and unable to stand.[22]   Some unidentified nurses and correctional

officers picked up Listau and laid her on her bunk, but no one took her vital signs.[23]

At approximately 8:42 a.m., defendant Collier entered Listau's cell and again

found Listau on the floor, rambling incoherently and unable to stand.[24]   Collier

informed defendants Fields, Wallace, Batie, Williams, Robinson, Montgomery,

Adams, and Jones of Listau's condition.[25]   Batie, in turn, informed defendant

---

[18] Doc. no. 53 (Second Amended Complaint) ¶ 38.

[19] *Id.* ¶ 41.

[20] *Id.* ¶ 42.

[21] *Id.* ¶ 43.

[22] *Id.* ¶¶ 44-45.

[23] *Id.* ¶¶ 46, 48.

[24] Doc. no. 53 (Second Amended Complaint) ¶ 49.

[25] *Id.* ¶¶ 50-51.

Morrison.[26]  Despite the obviousness of Listau's medical condition, no correctional officer or health professional took her vital signs, took her to the hospital, or did anything else to treat her.[27]  Instead, Listau was written up as refusing to cooperate with officers to prepare for a court appearance.[28]

At 9:00 a.m., defendants Montgomery and Guyton entered Listau's cell to verify her reported condition.[29]  Montgomery's notes from that encounter falsely state that Listau refused to allow the medical staff to check her vital signs.[30]  By that point, Listau was physically unable to communicate her medical needs, and she obviously needed to go to the hospital.[31]  All of the individual defendants, other than Sheriff Dorning, were aware of Listau's condition by this time.[32]

At 9:40 a.m., Wallace, Hooper, and Guyton again found Listau on the floor of her cell.  Listau was barely responsive, although she was still breathing.  Wallace, Hooper, and Guyton again picked up Listau, placed her on her bunk, and reported Listau's condition to Batie.  Batie, in turn, reported it to Morrison and unidentified

---

[26] *Id.* ¶ 52.

[27] *Id.* ¶¶ 53-55.

[28] *Id.* ¶¶ 55-56.

[29] *Id.* ¶ 57.

[30] Doc. no. 53 (Second Amended Complaint) ¶ 58.

[31] *Id.* ¶¶ 59-60.

[32] *Id.* ¶ 61.

ACH personnel.[33]  Listau did not receive any further treatment, including having her vital signs checked.[34]

At 11:19 a.m., Listau was found in her cell, completely unresponsive. Emergency personnel were contacted, and Listau was transported to the hospital, where she died the following day, March 12.[35]  An autopsy revealed that Listau died from severe blunt force injuries, including a broken left femur and multiple rib fractures.[36]  According to the Second Amended Complaint, "Listau most likely suffered these injuries as a result of one or more falls, presumably from her bunk, while in her medical watch cell at the jail."[37]  Her falls were the result of seizures related to DT's.[38]

Plaintiff alleges that five other inmates have died in the Madison County Jail since 2010.  In August of 2010, Julie Jean died as a result of lithium toxicity.[39]  In December of 2011, Emanuel Patterson also died of lithium toxicity.[40]  In May of 2012, Frederick Foster died of unspecified causes.[41]  In August of 2013, Deundrez

---

[33] *Id.* ¶ 62.

[34] *Id.* ¶¶ 63-64.

[35] *Id.* ¶¶ 23, 32, 65.

[36] Doc. no. 53 (Second Amended Complaint) ¶ 25.

[37] *Id.* ¶ 26.

[38] *Id.* ¶ 27.

[39] *Id.* ¶ 101.

[40] *Id.* ¶ 103.

[41] *Id.* ¶ 105.

Woods died from a blood clot that was a complication of untreated gangrene in his foot.[42]  In October of 2013, Tanisha Jefferson died from a ruptured intestine.[43]

To support his Fourteenth Amendment claim, plaintiff asserts that the individual defendants, other than Dorning and Johnson, were deliberately indifferent to Listau's serious medical needs because, despite being aware of those needs, they took no action, or insufficient action, to secure her treatment.[44]  Plaintiff also asserts that Dorning, Morrison, Johnson, Williams, and Robinson, as supervisory officials at the Madison County Jail, "were responsible for development and implementation of policies and procedures for medical care at the jail and by action and inaction established the unconstitutional customs and policies" that resulted in Listau's death.[45]  Sheriff Dorning also is alleged to be liable for the acts of ACH and its agents, because he delegated his final policymaking authority to those individuals.[46]  Finally, plaintiff alleges that defendant Madison County should be held liable for the other defendants' deliberate indifference to Listau's serious medical needs because it had a policy of inadequately funding inmate medical care.[47]

---

[42] Doc. no. 53 (Second Amended Complaint) ¶¶ 80-81.

[43] *Id.* ¶¶ 82-83.

[44] *Id.* ¶ 163.

[45] *Id.* ¶ 164.

[46] *Id.* ¶ 166.

[47] *Id.* ¶ 165.

To support his claim for negligence and/or wantonness, plaintiff asserts that all the ACH employees who were named as defendants failed to meet the standard of care applicable to inmates, thereby resulting in Listau's death.[48]   He also asserts that ACH is liable for its employees' failure to satisfy the applicable standard of care, because those employees were acting within the scope of their employment at all relevant times.[49]

## III. DISCUSSION

**A.     Motion to Dismiss of Defendant Arthur M. Williams, M.D.**

Defendant Arthur M. Williams, M.D., asks this court to dismiss the claim for negligence and/or wantonness asserted against him in Count Two of plaintiff's Second Amended Complaint.  That claim essentially is one for medical malpractice. Accordingly, it is governed by the Alabama Medical Liability Act.  *See* Ala. Code § 6-5-551 ("In any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, whether resulting from acts or omissions in providing health care, or the hiring, training, supervision, retention, or termination of care givers, the Alabama Medical Liability Act shall govern the parameters of discovery and all aspects of the action.").  The

---

[48] Doc. no. 53 (Second Amended Complaint) ¶ 168.

[49] *Id.* ¶ 169.

Alabama Act requires a complaint to include "a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff and shall include when feasible and ascertainable the date, time, and place of the act or acts." *Id.*   Courts have interpreted that statutory provision as requiring a plaintiff to give his defendant "'fair notice of the allegedly negligent act.'" *Betts v. Eli Lilly and Co.*, 435 F. Supp. 2d 1180, 1188 (S.D. Ala. 2006) (quoting *Mikkelsen v. Salama*, 619 So. 2d 1382, 1384 (Ala. 1993)).   "Any complaint which fails to include such detailed specification and factual description of each act and omission shall be subject to dismissal for failure to state a claim upon which relief may be granted." *Id.*

According to Dr. Williams, plaintiff's Second Amended Complaint does not contain a sufficiently detailed specification and factual description of his alleged acts and/or omissions, including the relevant dates, times, and places.   This court disagrees.   All of Dr. Wiliams's alleged acts and/or omissions occurred at the Madison County Jail between the morning of March 10, 2013, when Listau was booked, and approximately 11:19 a.m. on March 11, 2013, when the decision was made to transport her to the hospital.   During that well-defined time period, plaintiff alleges that Williams was aware of Listau's obviously severe medical condition, but

-13-

that he did not take any action to provide her with treatment.[50]   He also alleges that Williams' treatment of Listau (as well as that of all the other health care providers who were named as defendants) fell below the applicable standard of correctional health care.[51]   Finally, plaintiff alleges that Listau suffered and died as a result of Williams' failure to provide adequate care.[52]   These allegations are more than sufficient to place Williams on fair notice of plaintiff's claim against him. Accordingly, Williams' motion to dismiss is due to be denied.

**B.     Motion to Dismiss of the Correctional Officer Defendants Steve Morrison, Pamela Batie, Jessica Pothier, Vanessa Fields, Nick Wallace, Roslyn Guyton, and Randy Hooper**

The motion to dismiss addressed in this section was filed by the correctional officers who were on duty during Listau's incarceration (hereinafter collectively referred to as the "correctional defendants"), as well as by Steve Morrison, the Jail Administrator.[53]   All of these defendants assert that plaintiff's claim against them for their actual *participation* in deliberate indifference to serious medical needs should be dismissed because they are entitled to qualified immunity.   Morrison additionally

---

[50] *See id.* ¶¶ 34-36, 42, 51, 53-55, 60-61, 63, 66.

[51] *Id.* ¶ 70.

[52] *Id.* ¶¶ 66-67, 71.

[53] Defendant Christine Collier did not file a motion to dismiss or other responsive pleading, despite apparently having been served with a copy of plaintiff's original complaint.  *See* doc. no. 5, at 7.  Defendant Steve Morrison filed a motion on February 27, 2015, to quash service on Christine Collier.  Doc. no. 85. That motion remains pending.  *See* doc. no. 87 (text order requiring plaintiff's response to the motion to quash by March 13, 2015).

asserts that he cannot be held liable as a *policymaker* or *supervisor*, and that plaintiff has not asserted sufficient facts to satisfy the standard for pleading supervisory liability.

### 1.   Personal participation claims – correctional defendants and Morrison

The correctional defendants and Morrison assert that they are entitled to qualified immunity.  The doctrine of qualified immunity protects governmental officials who are sued under 42 U.S.C. § 1983 for money damages in their personal, or individual, capacities, but only so long as "their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Courts generally apply a two-part test for evaluating whether a defendant is entitled to qualified immunity. The "threshold question" for a district court to ask is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201 (2001).[54] If the threshold question is answered affirmatively, the court will proceed to analyze

---

[54] The defendant claiming immunity must also "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). Here, it cannot reasonably be disputed that the correctional defendants and Morrison were acting within the scope of their discretionary authority during all of the events that form the basis of plaintiff's claims.

the second aspect of the two-part inquiry: *i.e.,* "whether the right was clearly established." *Id.*[55]

In determining whether the unlawfulness of an official's actions was clearly established, "'the salient question is whether the state of the law [at the time of the unconstitutional act] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Williams v. Consolidated City of Jacksonville,* 341 F.3d 1261, 1270 (11th Cir. 2003) (alterations in original) (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)). The Supreme Court has rejected the requirement that the facts of previous cases must always be "materially similar" to those facing the plaintiff. *Hope,* 536 U.S. at 739. Instead,

> [f]or a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell* [*v. Forsyth,* 472 U.S. 511,] 535, n. 12, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

---

[55] The Supreme Court has relieved lower courts from mandatory adherence to the order of the two-part analysis articulated in *Saucier.* *See Pearson v. Callahan,* 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier,* we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."). It is now within this court's discretion to, in appropriate cases, assume that a constitutional violation occurred for the purpose of addressing, in the first instance, whether such a violation would be "clearly established." *Id.* That said, and under the circumstances of the present case, the tested sequence of analysis of *Saucier* will be followed.

-16-

*Hope,* 536 U.S. at 741 (alterations in original).

An officer can receive "fair notice" of his or her unlawful conduct in various ways.

First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law.* This kind of case is one kind of "obvious clarity" case. For example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.

Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law.* When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. *See Marsh* [*v. Butler County, Ala.*], 268 F.3d [1014,] 1031-32 n.9 [11th Cir. 2001]. For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional *without tying* that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation. These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances. These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are often immaterial to the later decisions. But for judge-made law, there is a presumption against wide principles of law. And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the

official acted.

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent *that is tied to the facts.*  That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court has said that "Y Conduct" is unconstitutional in "Z Circumstances."  We believe that most judicial precedents are tied to particularized facts and fall into this category.  . . . When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies.  On the other hand, if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law.

*Vinyard v. Wilson,* 311 F.3d 1340, 1350-52 (11th Cir. 2002) (emphasis in original,

alterations supplied).

Pursuant to this framework, the court must first determine whether the

allegations of plaintiff's Second Amended Complaint demonstrate that the

correctional defendants and Morrison violated Listau's right to be free from

deliberate indifference to her medical needs.  Such a claim requires allegations of:

(1) a serious medical need; (2) defendants' deliberate indifference to that need; and

(3) a causal link between the defendants' indifference and the plaintiff's resulting

injury.  *Mann v. Taser International, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).

In order to establish the deliberate indifference element, a plaintiff must show: "(1)

subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by

-18-

conduct that is more than gross negligence." *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010) (internal quotation marks and alteration omitted).

With respect to the "subjective knowledge" component, the Eleventh Circuit has held that a defendant "must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* must also draw the inference." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (emphasis in original) (citation, internal quotation marks, and alteration omitted). "No liability arises for 'an official's failure to alleviate a significant risk that he should have perceived but did not . . . .'" *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (omission in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 825 (1994)).

In determining whether a delay in treatment rises to the level of deliberate indifference, in the sense that the defendant had a "sufficiently culpable state of mind," *Farmer*, 511 U.S. at 834 (citation and internal quotation marks omitted) — in other words, the question of whether the defendant's actions or omissions constituted "more than gross negligence" — relevant factors include: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert v. Lee County*, 510 F.3d 1312, 1327 (11th Cir. 2007). The defendants' response to indications that a prisoner may need medical attention must have been "poor enough to constitute 'an unnecessary and wanton infliction of

pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnosi[s] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (alterations in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)).

Here, plaintiff alleges that Listau's serious medical condition was obvious to everyone at the jail, including Morrison and the correctional defendants.[56]  Listau suffered such apparent symptoms as inability to ambulate without assistance, strange behavior, inability to dress herself, and poor hygiene, and she became increasingly incoherent and unresponsive as the hours passed.[57]  Listau was placed in a medical watch cell, and she was monitored by correctional officers every fifteen minutes.[58]  Thus, Morrison and the correctional defendants "had numerous opportunities to save Listau's life by sending her to the hospital."[59]  They did not do so, however.  Instead, they took no action, or grossly inadequate action, to address Listau's obviously serious needs.[60]  Instead of acknowledging and addressing Listau's condition, the correctional officers falsely documented in jail records that she refused to cooperate

---

[56] Doc. no. 53 (Second Amended Complaint) ¶¶ 34-37, 40, 49-53, 60, 61.

[57] *Id.* ¶¶ 24, 45, 49, 62, 65.

[58] *Id.* ¶¶ 24, 41.

[59] *Id.* ¶ 33.

[60] *Id.* ¶¶ 34, 54, 63.

with their efforts to take her vital signs and dress her for a court appearance.[61]

These allegations are sufficient to state a claim that Morrison and the correctional defendants were subjectively aware of Listau's serious medical needs, but deliberately disregarded those needs, thereby resulting in Listau's pain, suffering, and eventual death.   Moreover, plaintiff's allegations, if proven to be true, will demonstrate violations of Listau's *clearly established* Fourteenth Amendment right to be free from deliberate indifference to serious medical needs.   Accordingly, plaintiff has stated a viable Fourteenth Amendment claim for deliberate indifference to a pretrial detainee's serious medical needs, and Morrison and the correctional defendants are not entitled to qualified immunity from that claim at this stage.

The court is not persuaded by defendants' arguments to the contrary. Defendants assert that plaintiff's claim against them is not viable because they reported Listau's medical condition to ACH personnel, who were contractually responsible for the health care of all inmates at the jail.   It is true, as a general rule, that "'supervisory [correctional] officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care.'"   *Cameron v. Allen*, 525 F. Supp. 2d 1302, 1307 (M.D. Ala. 2007) (quoting *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988);

---

[61] *Id.* ¶¶ 55-58.

*Williams v. Limestone County, Ala.*, 198 F. App'x 893, 897 (11th Cir. 2006)) (alteration in original).  Even so, correctional officers cannot ignore an inmate's obviously dire medical situation, regardless of whether medical personnel also are aware of the condition.  *See, e.g., Townsend v. Jefferson County,* 601 F.3d 1152, 1159 (11th Cir. 2010) (correctional officers were entitled to qualified immunity where the inmate had not "presented evidence that her situation was so obviously dire that two lay deputies must have known that a medical professional had grossly misjudged [her] condition") (alteration supplied, citations omitted).  As United States District Judge Myron Thompson stated in an unpublished, but nevertheless well-reasoned and highly persuasive opinion, "reporting medical concerns may or may not be enough to avoid deliberate-indifference liability, depending on the circumstances."  *McCall v. Houston County*, No. 1:11cv559-MHT, 2014 WL 3045552, *7 (M.D. Ala. July 3, 2014) (slip copy).  In the *McCall* case, Judge Thompson found that a correctional officer named West was not deliberately indifferent to an inmate's serious medical needs.

> Rather, [West's] failure to do more appears to be a combination of a misappraisal of the situation, in that he believed there was a medical problem but no emergency, along with dedication to following protocol and being satisfied with notifying other authorities.  That West was wrong, and was perhaps negligent, is insufficient to show deliberate indifference. *Goebert*, 510 F.3d at 1327 (conduct must constitute more than gross negligence).  West and Dye [another correctional officer] did

something to try to aid McCall: they alerted the medical unit and their supervisor. *While that might be insufficient under other circumstances, for example if McCall was visibly bleeding to death on the ground, in this case his symptoms were more ambiguous as to the urgency of the situation;* it was somewhat difficult to tell where mental illness ended and physical illness began.

*McCall,* 2014 WL 3045552, at *8 (alterations and emphasis supplied).

Here, in contrast, plaintiff has alleged that the seriousness of Listau's medical problems *was obvious* to everyone who saw her, including Morrison and all of the correctional defendants.  There was no ambiguity as to the urgency of her medical situation, which, construed in the light most favorable to plaintiff, was akin to "visibly bleeding to death on the ground."   Assuming those allegations are true, as the court must at the motion to dismiss stage, the failure of Morrison and the correctional defendants to personally take any action, *other than informing medical personnel*, to treat Listau constituted deliberate indifference to Listau's serious medical needs.

### 2.   Morrison's liability as a policymaker/supervisor

Plaintiff's Second Amended Complaint seeks to hold Morrison liable for Listau's death not only due to his personal participation in the alleged failure to provide Listau with adequate medical care, but also due to his supervisory and policymaking role as Administrator of the Madison County Jail.[62]  Morrison correctly

---

[62] Doc. no. 53 (Second Amended Complaint) ¶ 11 ("Dorning has delegated his statutory

points out that he cannot be held liable under § 1983 on the basis of *respondeat superior*, or vicarious liability.  *See, e.g., Belcher v. City of Foley,* 30 F.3d 1390, 1396 (11th Cir. 1994).  Even so, supervisor liability under § 1983 *can* rest

> when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation.  The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.  The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continuing duration, rather than isolated occurrences.

*Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990).  The causal connection may also be established "when the supervisor's improper 'custom or policy . . . resulted in deliberate indifference to constitutional rights.'" *Dalrymple v. Reno,* 334 F.3d 991, 996 (11th Cir. 2003) (quoting *Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir. 1991)).

Here, plaintiff's Second Amended Complaint alleges that Morrison is the individual to whom Sheriff Blake Dorning "has delegated his statutory duties regarding medical care."[63]  He also alleges that "Listau's serious medical needs were

---

duties regarding medical care to Morrison."), ¶ 73 ("Listau's serious medical needs were ignored because of the customs or policies of . . . Morrison . . . ."), ¶ 131 (reiterating that Morrison is the person "to whom Dorning has delegated responsibility for managing the jail").

[63] *Id.* ¶ 11.  *See also id.* ¶ 131 (reiterating that Morrison is the person "to whom Dorning has delegated responsibility for managing the jail").

ignored because of the customs or policies of defendants Dorning, Morrison, Johnson, Williams, Robinson, and ACH . . . ."[64]   More specifically, Morrison, Dorning, Johnson, Williams, Robinson, and ACH allegedly "failed to develop and implement adequate policies and procedures for the handling of inmates with serious health conditions and failed to adequately train correctional officers and medical staff, with the foreseeable result that inmates such as Listau would not receive appropriate treatment."[65]   Those defendants also "have established deliberately-indifferent customs or policies concerning inmate medical care, including but not limited to a custom or policy of delaying or denying necessary medical treatment to avoid liability for inmate medical bills."[66]   Those defendants also were

> part of an explicit or implicit agreement or plan to delay or deny necessary medical care to avoid having to pay for medical care for the inmate.  This plan included a custom or policy of delaying or denying necessary medical treatment by outside providers.  Defendants were aware this policy created a substantial risk of serious harm and inflicted unnecessary pain and suffering on inmates.[67]

Finally, those defendants

> were on notice that the above-described customs or policies regarding medical care for inmates were harmful to the health of inmates and caused them to experience unnecessary pain and suffering due to delay

---

[64] *Id.* ¶ 73.

[65] *Id.* ¶ 74.

[66] *Id.* ¶ 75.

[67] Doc. no. 53 (Second Amended Complaint) ¶ 76.

and denial of necessary medical care.  Defendants had such knowledge from prisoner complaints, communications from correctional officers, from their own observations, from common sense, from other deaths, from other lawsuits, and in other ways.[68]

Additionally, Morrison "was hired to cut costs at the jail."[69]  As such, he and Dorning "made it clear to correctional officers that inmate healthcare costs were a problem at the jail, that one trip to the hospital could potentially blow the county's healthcare budget, and that they needed to cooperate with ACH to control costs."[70] Morrison even discussed the need to control costs, and the potential "crippling" effect of inmate medical costs, in an April 2014 newspaper article.[71]  Morrison and Dorning also have established a longstanding practice of failing to investigate inmate grievances related to medical care and, instead, turning the grievances over to ACH, which is known to also not investigate.[72]  In fact, all aspects of jail healthcare are treated as being "solely within the discretion of ACH personnel."[73]  Morrison and Dorning have never requested ACH to make changes or improve the care of inmates, and they have never even requested that ACH report to them regarding the quality of

---

[68] *Id.* ¶ 77.

[69] *Id.* ¶ 97.

[70] *Id.* ¶ 93.

[71] *Id.* ¶¶ 94, 121, and Exhibit 2.

[72] *Id.* ¶¶ 110-12.

[73] Doc. no. 53 (Second Amended Complaint) ¶ 113.

care being provided to inmates.[74]  Morrison and Dorning have "failed and refused to evaluate the quality of inmate medical care and address the obvious systemic problems that led to at least 6 deaths over the course of just over three years."[75]  They also have a longstanding practice of failing to investigate health-care-related incidents at the jail, including even those that have resulted in the death of inmates.[76]

Importantly, plaintiff also asserts that "[t]he deferral of correctional officers to ACH decisions to delay and deny necessary medical care in the name of cost control is not only a matter of longstanding practice, it is also a matter of contract."[77] Plaintiff's allegations in this regard are essential to his theory of supervisory liability, and so they will be set out here in full:

> 123.   Deferral by correctional officers to ACH deliberate indifference is caused by both the letter of the contract and the structure of the contractual relationship.

> 124.  ACH has had the Madison County contract since before 2010.

> 125.  ACH underbid other competitors to get the contract.

> 126.  ACH got the contract by touting its ability to control the expenses Madison County would incur for outside medical care like that needed by Listau, Woods, and Jefferson.

---

[74] *Id.* ¶¶ 118-19.

[75] *Id.* ¶ 114.

[76] *Id.* ¶¶ 95-96.

[77] *Id.* ¶ 122.

127.  ACH, Madison County, and Dorning negotiated a $200,000 per quarter cap on outside medical care.

128.  If outside medical care costs exceeded $200,000 in a quarter, Madison County would be responsible.

129.  Based on historical healthcare expenditure numbers for the Madison County Jail and reasonable predictions based on data for the inmate population at the jail, the $200,000 per quarter number was designed to give ACH a financial incentive to control outside medical costs, which in turn has led ACH to delay and deny referrals to outside providers.

130.  Under the contract, if ACH beats the cap, ACH gets to keep the difference between actual outside costs and the cap as profit.

131.  As Morrison, to whom Dorning has delegated responsibility for managing the jail, has stated publically, hospitalizations can quickly deplete the quarterly budget . . . .

132.  Pursuant to this agreement, correctional officers are trained to defer to ACH regarding medical matters regardless of the severity of the inmate's condition.[78]

Correctional officers also are trained to defer to ACH on all medical matters, and not to contact outside emergency personnel.[79]  Officers can be disciplined if they contact outside emergency personnel, and they are indemnified by ACH's insurance company only if they defer to ACH.[80]  Because of the ACH agreement and its indemnity provisions, "Dorning and Morrison have failed and refused to address

---

[78] *Id.* ¶¶ 123-32.

[79] Doc. no. 53 (Second Amended Complaint) ¶¶ 132-33.

[80] *Id.* ¶¶ 134-38.

known systemic deficiencies regarding medical care at the Madison County Jail."[81]

Instead, Dorning and Morrison cooperated with ACH in controlling costs, even

though they knew that doing so resulted in the denial of medical care to inmates.[82]

The cost control measures implemented by ACH, and approved by Dorning and

Morrison, included "staff[ing] the Madison County Jail inadequately, hir[ing] sub-

standard medical personnel willing to put costs over inmate health and safety,

den[ying] inmates medications, and delay[ing] or den[ying] medically-necessary

referrals to outside providers, including necessary medical treatment like that denied

Listau, Woods, and Jefferson."[83]   Additionally, Morrison, along with Dorning,

Williams, and Robinson,

> developed a policy and practice regarding treatment of inmates
> withdrawing from alcohol and drugs.  While defendants were aware that
> severe withdrawal symptoms, including DT's, could only be safely
> treated in a hospital, these defendants established a custom or policy that
> withdrawal would **always** be managed inside the jail or by getting the
> person released from jail, regardless of the severity of the symptoms.[84]

Morrison argues that, in spite of these detailed allegations, no claim against

him as a supervisor or policymaker can stand, because he "is *not* authorized or

---

[81] *Id.* ¶ 143.

[82] *Id.* ¶¶ 144-45.

[83] *Id.* ¶ 151 (alterations supplied).

[84] *Id.* ¶ 155 (emphasis in original).

charged with creating or implementing jail policy."[85]  Morrison relies upon Section

14-6-1 of the Alabama Code, which states:

> *The sheriff* has the legal custody and charge of the jail in his or her county and all prisoners committed thereto, except in cases otherwise provided by law.  The sheriff may employ persons to carry out his or her duty to operate the jail and supervise the inmates housed therein for whose acts he or she is civilly responsible.  *Persons so employed by the sheriff shall be acting for and under the direction and supervision of the sheriff* and shall be entitled to the same immunities and legal protections granted to the sheriff under the general laws and the Constitution of Alabama of 1901, as long as such persons are acting within the line and scope of their duties and are acting in compliance with the law.

Ala. Code § 14-6-1 (emphasis supplied).  According to Morrison, if the Sheriff had

sole authority over the jail, then *he* (Morrison) could have had no authority. *See Doe*

*v. School Bd. of Broward County, Fla*., 604 F.3d 1248, 1264 (11th Cir. 2010)

("[F]inal policymaking authority over a particular subject matter does not vest in an

official whose decisions are 'subject to meaningful administrative review.'") (quoting

*Scala v. City of Winter Park*, 116 F.3d 1396, 1399, 1401 (11th Cir.1997)) (alteration

supplied).

Morrison relies upon the decision of the Middle District of Alabama in *McCall*

*v. Houston County, supra.*  There, the plaintiff sought to hold Reed, the Houston

---

[85] Doc. no. 65 (Brief in Support of Motion to Dismiss Second Amended Complaint of Defendants Steve Morrison, Pamela Batie, Jessica Pothier, Vanessa Fields, Nick Wallace, Roslyn Guyton, and Randy Hooper), at 20 (emphasis in original).

County Jail Administrator, liable for deliberate indifference under a policymaker theory. Reed advanced the same argument Morrison has advanced here: *i.e.,* "that he had the authority only to implement policy, not the authority to create it. The latter power, he argues, is vested in the sheriff alone." *McCall,* 2014 WL 3045552, at *12. Reed's deposition testimony revealed that, while he did sometimes make changes to jail policies, he always had to obtain the Sheriff's approval first. *Id.* Because there was no *evidence* that any policies were attributable to Reed, instead of the Sheriff, Reed could not be held liable in his supervisory capacity for any constitutional violations caused by those policies. *Id.*

The *Reed* decision suggests that there are certain circumstances under which a Jail Administrator may be absolved from policymaking liability because the Sheriff retains the final policymaking authority. It cannot, however, stand for the broad proposition that a Jail Administrator in Alabama can *never* be held liable, as a policymaker, for constitutional violations. Indeed, the Eleventh Circuit has allowed such claims against Jail Administrators in the past. *See, e.g., Harper v. Lawrence County, Ala.,* 592 F.3d 1227, 1236-37 (11th Cir. 2010); *Danley v. Allen,* 540 F.3d 1298, 1313-16 (11th Cir. 2008). Thus, plaintiff's supervisory/policymaking liability claim against Morrison will not be dismissed under Alabama Code § 14-6-1. Plaintiff is at least entitled to conduct discovery on that claim to determine the extent of

Morrison's supervisory and policymaking authority.

Morrison also argues that plaintiff has not pled sufficient *facts* to state a claim against him for supervisory or policymaking liability.   That argument is without merit.   To the contrary, as set forth above, plaintiff has alleged plentiful facts demonstrating that Morrison's customs and/or policies caused the alleged violations of Listau's constitutional rights.   Morrison cites to the County's health care services agreement with ACH in an attempt to demonstrate that, because the contract calls for adequate health care to be provided to inmates, Morrison cannot be held responsible for any constitutionally inadequate care.   Stated slightly differently, Morrison asserts that the ACH contract is a facially constitutional policy, and as long as Morrison followed it, he cannot be held liable.   Plaintiff's complaint alleges more than that, however.   He asserts that the contract has been manipulated and evaded in attempts to reduce costs, thereby resulting in constitutionally inadequate medical care for inmates.

Plaintiff also alleged that Morrison was on notice that the County's policies and customs regarding inmate medical care caused the denial and/or delay of care. Contrary to Morrison's suggestion, plaintiff did not make that allegation based on Morrison's knowledge of past inmate deaths alone.  Instead, Morrison's knowledge also came from prisoner complaints, communications from other correctional officers,

his own observations, common sense, other lawsuits, and in other ways.  If discovery reveals that Morrison did not, in fact, have any such knowledge, he will not be held liable on that basis.  For the time being, however, plaintiff has pled sufficient facts to state a claim for violation of Listau's clearly established rights and to consequently move plaintiff's supervisory/policymaker liability claim against Morrison past the motion to dismiss stage.

## C.    Motion to Dismiss of Defendant Blake Dorning

Plaintiff's claim against defendant Blake Dorning for the most part mirrors the supervisory/policymaker liability claim asserted against Morrison, except that plaintiff has included a few additional factual allegations with regard to Dorning.  He alleges that Dorning has a "general practice" of failing and refusing to investigate all serious incidents — not just health-care-related ones — involving his deputies.[86] Dorning has also commented to the media that he believes ACH will make changes in the jail healthcare system as a result of other inmate deaths, but in truth, he knows that ACH has a history of failing to respond to inmate deaths and other health-care-related incidents.[87]  Dorning was aware that ACH's business model elevated cost control over inmate safety, but he, nonetheless, retained ACH as the jail health care

---

[86] Doc. no. 53 (Second Amended Complaint) ¶¶ 98-99.

[87] *Id.* ¶¶ 115-17.

contractor, and rejected other, competing contractors because of the cost savings ACH provided.[88]

Plaintiff also alleges that, while "Alabama law vests final policymaking authority for inmate medical care in Dorning," Dorning delegated that authority to ACH via the County's agreement with ACH and "longstanding practice."[89] According to plaintiff, this renders Dorning liable for ACH's decisions.[90] Additionally:

> While the agreement [between the County and ACH] gives Dorning and Madison County the authority to hold ACH accountable regarding the costs of inmate healthcare, it provides no mechanism for reporting and accountability regarding the quality of inmate healthcare, and neither Dorning nor Madison County have made any effort to hold ACH accountable for how it handles inmate healthcare.[91]

Dorning argues that plaintiff's allegations are too conclusory, and lacking in sufficient factual detail, to satisfy the pleading standard for supervisory/policymaker liability claims. He also asserts that he cannot be held liable for constitutional violations resulting from Madison County's facially constitutional contract with ACH. These are the same arguments advanced by Morrison. As with Morrison, the court is not persuaded by those arguments, and finds that plaintiff has stated sufficient

---

[88] *Id.* ¶¶ 147-48.

[89] *Id.* ¶¶ 152-53.

[90] *Id.* ¶ 153.

[91] *Id.* ¶ 154 (alteration supplied).

facts which, if proven to be true, would demonstrate Dorning's violations of Listau's clearly established rights.

Dorning also asserts that he cannot be held liable for his delegation of policymaking authority to ACH.  Plaintiff has effectively alleged that, because Dorning delegated final policymaking authority to ACH, he has become the final decisionmaker or policymaker for all of ACH's actions and policies and is liable for any constitutional violations resulting therefrom.  The Eleventh Circuit has

> strictly interpreted "*Monell*'s policy or custom requirement to preclude § 1983 liability for a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion." *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997).  In other words, final policymaking authority over a particular subject matter does not vest in an official whose decisions are "subject to meaningful administrative review." *Id*. at 1401.  *Compare Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir. 1996) (accepting concession that city police chief was not final policymaker with respect to employment decisions where police chief's decisions could be reversed by the city manager) *with Martinez v. City of Opa–Locka, Fla*., 971 F.2d 708, 714-15 (11th Cir. 1992) (finding final policymaking authority where "the City Manager's decision to hire or fire administrative personnel is completely insulated from review").

*Doe v. School Bd. of Broward County, Fla*., 604 F.3d 1248, 1264 (11th Cir. 2010).

Here, Dorning asserts that he never delegated *final* policymaking authority to ACH because the County's contract with that entity requires ACH to be accountable

to the County for certain performance, staffing, and reporting requirements.[92] Plaintiff has not relied solely upon those formal contractual requirements, however. Plaintiff also asserts that Dorning's delegation of authority to ACH has been a matter of long-standing *practice*, and that the written terms of the contract have been disregarded in actual practice.  Moreover, plaintiff has alleged that Dorning has not made any effort to hold ACH accountable for the manner in which it handles inmate health care under the contract.  These allegations, if eventually supported by the evidence, could demonstrate violations of Listau's clearly established rights. Accordingly, this claim will not be dismissed for failure to state a claim upon which relief can be granted, and Dorning is not entitled to qualified immunity from this claim at the motion to dismiss stage.

## D.     Motion to Dismiss of Defendant Madison County, Alabama

Plaintiff's claim against Madison County is based solely upon the County's alleged failure to adequately fund its jail.[93]  It is well-established that the County's sole responsibility with regard to jails is to fund them.  *See Turquitt v. Jefferson County, Ala.,* 137 F.3d 1285, 1289-90 (11th Cir. 1998) ("We recognize that Alabama

---

[92] Doc. no. 63 (Brief of Blake Dorning in Support of Motion to Dismiss Second Amended Complaint), at 26-27 (citing the contract between the County and ACH, which was attached to the Second Amended Complaint as Exhibit 1, at ¶¶ 6(G), (I), (L), & (Q)).

[93] Doc. no. 70 (Plaintiff's Response to Madison County's Motion to Dismiss), at 2 ("Plaintiff only seeks to hold Madison County liable for its failure to adequately fund medical care, which the Eleventh Circuit has recognized as a viable claim.") (citations omitted).

counties possess some duties with respect to county jails.  However, none of these

duties relates to the daily operation of the jails or to the supervision of inmates.  The

duties of the counties with respect to the jails 'are limited to funding the operation of

the jail and to providing facilities to house the jail.'") (quoting *Stark v. Madison

County*, 678 So.2d 787, 787 (Ala. Civ. App. 1996)).  Moreover, a

> County's liability cannot be dependent on the scant likelihood that its
> budget decisions would trickle down the administrative facets and
> deprive a person of his constitutional rights. Instead, liability must be
> premised on a finding that "*this*" budget decision was "highly likely to
> inflict the *particular* injury" [the plaintiff] suffered.

*McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004) (*quoting Board of County

Commissioners v. Brown*, 520 U.S. 397, 412 (1997)) (emphasis in original, alteration

supplied).  To ensure that the causation requirement is satisfied, the court should

"look to whether a complete review of the budget decision . . . reveals that the

[County] should have known that [the plaintiff's] injuries were a 'plainly obvious

consequence' of that decision."  *McDowell,* 392 F.3d at 1292 (quoting *Brown*, 520

U.S. at 412) (alterations supplied).

Here, plaintiff's failure-to-fund claim against the County rests upon the

following allegations:

> 145.   Defendants Madison County and ACH and all individual
> defendants were aware [that] the cost control measures implemented at
> the Madison County Jail by ACH resulted in the denial of

-37-

constitutionally-required medical care for inmates with serious medical needs.

146.   ACH's business model, reflected in the agreement, succeeds by underbidding the competition and implementing severe cost control measures, the necessary result of which is unnecessary inmate suffering and liability claims (dealt with through liability insurance).

147.   Defendants Dorning and Madison County were aware of ACH's business model, were aware [that] ACH put cost control over inmate health and safety, yet retained ACH as the contractor (initially and via contract renewals) because it saved the county money.

148.   Madison County and Dorning rejected other contractors because they believed ACH saved them money.

149.   Thus, Madison County caused or contributed to the above-described customs or policies by not providing adequate funds for inmate medical care.[94]

Plaintiff also alleges that Madison County

intentionally refused to adequately fund medical care as described above with deliberate indifference to the serious medical needs of inmates such as Listau, had a policy of not adequately funding inmate medical care, and did thereby contribute to cause Listau's suffering and eventual death and the individual defendants' denial of necessary medical treatment for Listau's serious medical needs.[95]

The County contends that it cannot be held liable for failing to adequately fund health care at the jail because the County's contract with ACH does not include any kind of monetary cap for the county's liability.  Indeed, the only cap is the $200,000

---

[94] Doc. no. 53 (Second Amended Complaint) ¶¶ 145-49 (alterations supplied).

[95] Id. ¶ 165.

quarterly cap on ACH's liability for outside medical costs.  Even so, a contractual

monetary cap on the County's liability to fund medical care at the jail is not the basis

of plaintiff's failure-to-fund theory.  Instead, plaintiff's theory is that "the structure

of the contract with ACH, including the $200,000 quarterly cap on outside healthcare

expenses and the indemnification of correctional officers by ACH, encourages all

parties involved to deny inmates outside medical care."[96]  More specifically, plaintiff

asserts that Listau's death (and the suffering experienced by other inmates) was the

result of the County's acts of

> 1) hiring the cheapest contractor based on promises by the contractor
> regarding its ability to control outside medical care costs; 2) delegating
> to that contractor complete authority over outside medical referrals; 3)
> using a quarterly cap on outside services to give the contractor a strong
> economic incentive to deny outside medical care to inmates; 4)
> evaluating the contractor's performance based on cost-control only; 5)
> ignoring and refusing even to investigate known incidents of deliberate
> indifference by the contractor, including at least 6 deaths over roughly
> 3 years; and 6) continuing to retain the contractor despite knowledge of
> its unconstitutional practices.[97]

Essentially, plaintiff asserts the contract encourages exploitation by ACH, which

increases its profit margin if it keeps quarterly outside medical care costs under

$200,000, and that the County knew about that exploitation but was deliberately

indifferent to it.  Those allegations are sufficient to state a claim for deliberate

---

[96] Doc. no. 70 (Plaintiff's Response to Madison County's Motion to Dismiss), at 2.

[97] *Id.* at 4 (citing doc. no. 53 (Second Amended Complaint) ¶¶ 124-54).

indifference to Listau's serious medical needs.

## IV. CONCLUSION AND ORDERS

In accordance with the foregoing, all pending motions to dismiss are DENIED. It is further ORDERED that the stay on discovery is LIFTED,[98] and all parties are directed to proceed forthwith to conduct discovery in accordance with the Uniform Initial Order.

DONE this 9th day of March, 2015.

United States District Judge

---

[98] *See* doc. no. 75 (order granting motion to stay discovery pending a ruling on the motions to dismiss).